2014 COA 163

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Jack Virgil GINGLES, Defendant–Appellant.**

**Court of Appeals No. 11CA1466**

Colorado Court of Appeals, Div. III.

Announced December 4, 2014

◈☞128

John W. Suthers, Attorney General, Jacob R. Lofgren, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Adam Mueller, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE DAILEY

¶ 1 Defendant, Jack Virgil Gingles, appeals the judgments of conviction entered on jury verdicts finding him guilty of second degree kidnapping, robbery, aggravated motor vehicle theft, and vehicular eluding (two counts). We affirm and remand with directions to correct the mittimus.

## I.  Background

¶ 2 Defendant borrowed a vehicle from a friend.  When defendant appeared to "tense up" while next to a sheriff's deputy on Interstate 25, the deputy checked the license plates on the car defendant was driving and discovered that it had been reported stolen. After another sheriff's deputy arrived to provide backup, the deputies in both patrol vehicles activated their emergency lights and attempted to pull defendant over.  Defendant immediately sped away, however, driving (1) on and off the interstate; (2) through various residential neighborhoods and commercial areas; (3) on and off the interstate again; (4) through a barbed wire fence, into a dirt field; (5) across a two- to three-foot wide ravine and through another barbed wire fence; and (6) onto the interstate again.

¶ 3 Both deputies chased him until he went through the second barbed wire fence.  Only one of the deputies was able to navigate a way through that fence and continue the pursuit onto the interstate.  There, that deputy attempted to stop defendant by perform-

ing a "PIT maneuver,"[1] but defendant spun out and "shot through a green [grassy] area" between the interstate and an exit ramp, where defendant's car broke down. The deputy pulled in behind him.

¶ 4 Both defendant and the deputy got out of their vehicles and ran across the interstate, the deputy cautiously following defendant. Across the interstate, defendant stopped another vehicle coming up the entrance ramp and got in. According to that vehicle's driver, defendant told her, "I have a gun," or "I'll shoot you." Two witnesses, including the deputy, testified that they saw defendant push the driver out of the vehicle[2] before driving away and nearly hitting the pursuing deputy in the process.

¶ 5 Using forensic evidence collected from the stolen car and the innocent driver's car, police identified defendant and charged him with second degree kidnapping, second degree assault, aggravated robbery, aggravated motor vehicle theft (two counts), and vehicular eluding (two counts).

¶ 6 In a video-recorded confession he gave police, defendant admitted his involvement in the incident, but said

- he borrowed the vehicle not knowing it was stolen;

- he did not have a gun with him in the innocent driver's vehicle;

- he did not push the innocent driver out of her vehicle or otherwise touch her; and

- he never threatened the innocent driver and she must have misunderstood him when, in reference to the deputy, he said, "He's going to shoot me."

¶ 7 Although defendant did not testify at trial, he argued, consistent with his confession, that (1) he did not intend to injure the driver; (2) he did not have a gun with him in her car; and (3) he did not kidnap her because he never had control of her vehicle while she was inside it.

¶ 8 A jury found defendant guilty, as charged, of second degree kidnapping, one count of aggravated motor vehicle theft, and two counts of vehicular eluding. The jury also found him guilty of robbery and third degree assault, as lesser-included offenses of his other charges. Subsequently, the trial court sentenced him to a controlling term on the kidnapping count of twenty years imprisonment in the custody of the Department of Corrections.

## II. Unrestricted Jury Access to Defendant's Videotaped Confession

█ ¶ 9 Defendant contends that the trial court erred in permitting the jury to have unfettered access to the video recording of his confession. We are not persuaded.

¶ 10 Defense counsel ·stated that she "d[id]n't have any objection to [the jury] wanting to see it as often as possible," but she did not want it to have unfettered access to the video recording. Accordingly, she requested that the court not give the jury access to the video unless and until the jury requested to view it.

¶ 11 The trial court noted its familiarity with *Frasco v. People,* 165 P.3d 701 (Colo. 2007), and *DeBella v. People,* 233 P.3d 664 (Colo.2010), both of which address a jury's unfettered access to video recordings of interviews of child sexual assault victims. It concluded that, because a video recording of a defendant's statement was "different from" the "videotape of a child sexual assault victim's interview," the jury should have unrestricted access to defendant's confession. In addition, the court noted that defendant would not be prejudiced because various statements in the video would "inure to the defendant's benefit, if they are believed by the jury."[3]

---

1. A "PIT maneuver" involves "com[ing] up on one side of the vehicle and nudg[ing] it to one side to get it to stop."

2. The driver testified that she had not been pushed by defendant, but simply fell out of the car while attempting to escape at the same time·

defendant stepped on the gas to get away. The driver broke her tail and pelvic bones as a result of the fall.

3. For this reason, the court did not provide the jury with a limiting instruction.

¶ 12 Generally, a jury is permitted to take into the jury room all exhibits received into evidence, subject to the trial court's discretion to order otherwise. *See Frasco*, 165 P.3d at 703. The trial court has an obligation, however, to ensure that " 'evidence is not so selected, nor used in such a manner, that there is a likelihood of it being given undue weight or emphasis by the jury.' " *Id.* (quoting *Settle v. People*, 180 Colo. 262, 264, 504 P.2d 680, 680–81 (1972)). "This obligation is particularly pronounced with respect to jury access during deliberations to portions of trial testimony (as in *Settle* ) and to exhibits substituting for trial testimony." *People v. Jefferson*, 2014 COA 77M, ¶ 10, —— P.3d ——.

> The fear expressed with respect to documents of testimonial character is that they present an unfair advantage to the proponent in having only this single segment of the entire trial testimony before the jury during deliberations. The foregoing applies as well to requests by the jury for videotape recordings, tape recordings, transcripts of testimony, or for having portions of testimony replayed or reread.

1 Michael H. Graham, *Winning Evidence Arguments* § 403:2, at 357–58 (2006) (footnote omitted).

¶ 13 Consequently, "a trial court must 'oversee with caution' the jury's use of exhibits of a testimonial character, including video recorded interviews of witnesses." *Jefferson*, ¶ 11 (quoting *Frasco*, 165 P.3d at 703–04); *see id.* at ¶ 17 (likening a jury's unrestricted access to a witness's videotaped statement to bringing the witness into jury deliberations to repeat exactly what was presented in the prosecution's case).

¶ 14 But does the same rule apply to videotaped statements of a defendant which have been admitted into evidence? In *Jefferson*, the division found it unnecessary to address that question. *See id.* at ¶ 11, n. 2.

¶ 15 Colorado cases decided before *Frasco* and *Jefferson* drew a distinction, in this context, between transcripts or recordings of out-of-court statements of witnesses and transcripts or recordings of confessions by defendants. The former were categorically excluded from the jury room, while the latter were categorically allowed into the jury room, for whatever consideration the jury would give them. *See People v. Ferrero*, 874 P.2d 468, 473 (Colo.App.1993) (involving videotape of a defendant's confession); *People v. Miller*, 829 P.2d 443, 446 (Colo.App.1991) (involving transcript of a defendant's confession).

¶ 16 *Frasco* removed the categorical bar on jury access during deliberations to transcripts or recordings of witness statements. It did not, however, address the issue of jury access to a defendant's confession.

¶ 17 Historically, in contrast to a witness's statement, a defendant's confession was allowed to be used by the jury in the jury room because a confession's "centrality in the case warrants whatever emphasis may result." 2 Kenneth S. Broun, *McCormick on Evidence* § 220, at 76 (7th ed.2013); *see, e.g., Ferrero*, 874 P.2d at 472–73 ("A confession which has been shown by the state to be free from coercive conditions is among the strongest kind of *physical* evidence the prosecution may produce." (emphasis added)); *Flonnory v. State*, 893 A.2d 507, 528–29 (Del.2006) (Although the concern that a "jury might give undue emphasis and credence to those statements over all of the other trial testimony . . . arguably applies to confessions or other incriminating statements of a defendant, . . . written or recorded confessions or incriminating statements of a defendant . . . should generally go into the jury room during deliberations because of the[ir] centrality . . . to the State's case."); *see also State v. Castelli*, 92 Conn. 58, 101 A. 476, 480 (1917) ("If [the defendant's written confessions] were harmful, it was not because any rule of procedure was violated, but because the accused had furnished harmful evidence against themselves.").

¶ 18 The supreme court, in *Frasco*, permitted *greater* jury access to testimonial statements of witnesses. *See* 165 P.3d at 704–05. In doing so, it gave no indication (1) that the jury should have *less* access to a defendant's confession, or (2) that a defendant's confession must be treated in the same manner as the testimonial statement of a witness. *See id.* Because the historical reason for treat-

ing a defendant's confession differently retains its vitality, we confirm the continuing viability of the rule in Colorado allowing unrestricted jury access during deliberations to a defendant's voluntary and otherwise admissible confession. *See Ferrero,* 874 P.2d at 473.

¶ 19 Consequently, we discern no error on the part of the trial court here.

### III.  Robbery Instruction

■ ¶ 20 Defendant next contends that the trial court erroneously instructed the jury that he could be convicted of robbery based on the use of force, threats, or intimidation "against any person" rather than against the innocent driver specifically.  We decline to consider this contention because, as the People contend, defense counsel invited any error that may have occurred.

■ ¶ 21 Under the "invited error" doctrine, a defendant may not complain on appeal of an error he "invited or injected" into the case, and so "must abide the consequences of his ... acts." *People v. Chavez,* 2012 COA 61, ¶ 50, 318 P.3d 22.  The invited error rule

■ "prevents a party from inducing an inappropriate or erroneous [ruling] and then later seeking to profit from that error.  The idea of invited error is ... to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error.  Having induced an error, a party in a normal case may not at a later stage of the [proceedings] use the error to set aside its immediate and adverse consequences."

*Horton v. Suthers,* 43 P.3d 611, 618 (Colo. 2002) (quoting with approval *Roberts v. Consolidation Coal Co.,* 208 W.Va. 218, 539 S.E.2d 478, 488 (2000)).

¶ 22 Here, the prosecution submitted a jury instruction enumerating, as the elements of aggravated robbery,

1.   That the defendant,

2.   in the State of Colorado, at or about the date and place charged,

3.   knowingly,

4.   took anything of value, namely: a vehicle,

5.   from the person or presence of [the innocent driver],

6.   by the use of force, threats, or intimidation *against any person,* and

7.   during the act of Aggravated Robbery or the immediate flight therefrom,

8.   knowingly,

9.   possessed an article used or fashioned in a manner to lead any person who was present reasonably to believe it to be a deadly weapon, namely: a gun, or the defendant represented verbally or otherwise that the defendant was then and there so armed.

(Emphasis added.)

¶ 23 During a jury instruction conference, defense counsel indicated that she was "submitting [instructions on] two lesser included offenses," including robbery.  When asked by the court if she had prepared such instructions, she stated, "I just emailed them to the district attorney last night.  He was going to format them for me so that they would be the identical format as the other instructions."  The instruction tendered to the court stated:

The elements of the crime of Robbery are:

1.   That the defendant,

2.   in the State of Colorado, at or about the date and place charged,

3.   knowingly,

4.   took anything of value, namely: a vehicle,

5.   from the person or presence of [the innocent driver],

6.   by the use of force, threats, or intimidation *against any person.*

(Emphasis added.)

¶ 24 When the court asked defense counsel if she had any objections to the "form, order, or content of the instructions," she replied that she did not.  Consequently, the trial court gave the jury the tendered instruction on robbery.[4]

4.   Neither the pattern instruction for aggravated

robbery nor the pattern instruction for robbery

¶ 25 Because defense counsel proposed the instruction, the invited error doctrine bars defendant's challenge to it on appeal. *See, e.g., Townsend v. People,* 252 P.3d 1108, 1112 (Colo.2011) ("Under the invited error doctrine, we will not review alleged errors in jury instructions drafted and tendered by the defense."); *see also People v. Gross,* 2012 CO 60, ¶ 11, 287 P.3d 105 (When defense counsel tenders an instruction, it is "an intentional, strategic decision" not subject to the attorney incompetence exception to the invited error doctrine.).

¶ 26 In so concluding, we necessarily reject defendant's assertions that the invited doctrine is inapplicable because (1) the prosecutor is the one who physically tendered the instruction to the court, and (2) the prosecution, not the defense, should be blamed for the allegedly erroneous instruction, because defense counsel merely borrowed, for the robbery instruction, the prosecutor's challenged language from the aggravated robbery instruction.

¶ 27 With respect to defendant's first assertion, it was the defense, not the prosecution, who wanted the jury instructed on the offense of simple robbery. And it was defense counsel who drafted the robbery instruction. Although the prosecutor agreed to format the text of the instruction to make it appear uniform and to print it for the court, that clerical task did not transfer the responsibility for the text of the instruction from the defense to the prosecution.

¶ 28 Nor is relief warranted by the "fact" that defense counsel supposedly borrowed the "against any person" language from the prosecutor's proffered instruction on aggravated robbery. As an initial matter, we note that defendant's position with respect to presence of the "against any person" language in the aggravated robbery instruction differs, depending on whether one is reading his opening or his reply brief. In his open-

ing brief, defendant argues that the "against any person" language of the aggravated robbery statute, section 18–4–302(1)(d), C.R.S. 2014, "clearly anticipates liability for aggravated robbery when a defendant takes property from one person while leading a different person to believe he possesses a deadly weapon." Thus, he asserts, the use of the "against any person" language in the aggravated robbery instruction was appropriate. But in his reply brief, when trying to blame the prosecution for the presence of the challenged language in the robbery instruction, he changes tack and argues in conclusory fashion that the use of the language in the aggravated robbery instruction was erroneous, and that the prosecutor was (somehow) responsible for defense counsel's wording of the robbery instruction.

¶ 29 In light of the contradictory, cursory, and undeveloped manner in which defendant presents this second assertion, we decline to address it. *See United States v. Van Smith,* 530 F.3d 967, 973–74 (D.C.Cir.2008) ("To be sure, an appellant may use his reply brief to respond to a contention made by the appellee. But that is not what happened here.... [Appellant] used his reply brief to change course altogether and make a new and contradictory argument.... Our rules do not allow such bait-and-switch tactics." (citation omitted));[5] *People v. Wallin,* 167 P.3d 183, 187 (Colo.App.2007) (declining to address arguments presented in a perfunctory or conclusory manner).

### IV. Double Jeopardy

■ ¶ 30 We disagree with defendant's contention that his two convictions for vehicular eluding were imposed in violation of constitutional double jeopardy guarantees.

¶ 31 We note that defendant did not properly preserve this contention in the trial court, and that, in similar circumstances, sev-

---

contains the "against any person" language. *See* COLJI–Crim. 4–3:06 (2014) (aggravated robbery, suggestion or representation of a deadly weapon); COLJI–Crim. 43:01 (2014) (robbery).

**5.** *Cf. Harrington v. Anderson,* 23 Colo.App. 415, 419–20, 130 P. 616, 618 (1913) (refusing to consider an argument, asserted for the first time in a petition for rehearing, which contradicted the

position taken by the party at trial and on appeal); *Estate of Bell v. Shelby Cnty. Health Care Corp.,* 318 S.W.3d 823, 834 (Tenn.2010) ("[A] petition for rehearing is not an appropriate vehicle for advancing a contradictory position when earlier arguments have proved to be unsuccessful.").

eral divisions of this court have considered such arguments waived for purposes of appeal. *See People v. Poindexter,* 2013 COA 93, ¶¶ 42–43, 338 P.3d 352 (declining to address double jeopardy claims raised for the first time on appeal); *People v. Cooper,* 205 P.3d 475, 478 (Colo.App.2008) (same); *People v. Johnson,* 74 P.3d 349, 356 (Colo.App.2002) (same). However, we also note that other divisions of this court have reviewed unpreserved double jeopardy claims for plain error. *See, e.g., People v. Friend,* 2014 COA 123M, ¶ 49, —— P.3d ——; *People v. Tillery,* 231 P.3d 36, 47–48 (Colo.App.2009), *aff'd sub nom. People v. Simon,* 266 P.3d 1099, 1104–06 (Colo.2011); *People v. Flowers,* 128 P.3d 285, 290 (Colo.App.2005); *People v. Cruthers,* 124 P.3d 887, 890 (Colo.App.2005); *People v. Olson,* 921 P.2d 51, 53 (Colo.App.1996).

¶ 32 We recognize that the supreme court has recently accepted certiorari in a number of cases to resolve this issue. *See, e.g., People v. Smoots,* 2013 COA 152, —— P.3d —— (cert. granted in part June 30, 2014); *People v. Zadra,* 2013 COA 140, —— P.3d —— (*cert. granted in part* Sept. 29, 2014); *People v. Zubiate,* 2013 COA 69, —— P.3d —— (*cert. granted in part* June 16, 2014). In the meantime, however, we conclude that, because Crim. P. 52(b) gives us the discretion to address errors that both are "plain" and "affect[ ] substantial rights," and because the right to be protected against double jeopardy is a substantial right, we may review defendant's double jeopardy claim for plain error. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (court should exercise discretion where the error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings' " (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985))).

¶ 33 In our view, no error occurred here.

¶ 34 The prosecutor charged defendant with two counts of vehicular eluding, one for each of the two deputies involved in chasing him. Both deputies pursued defendant until he drove through the second barbed wire fence to get back on the interstate, at which point, only one deputy continued the chase. That deputy attempted to stop defendant by performing a PIT maneuver, from which defendant spun out and continued driving until his car broke down.

¶ 35 On appeal, defendant argues that because he only engaged in one volitional act of vehicular eluding, the two counts are multiplicitous and should merge into one conviction.

¶ 36 " 'Multiplicity is the charging of the same offense in several counts, culminating in multiple punishments' " in violation of constitutional prohibitions against double jeopardy. *People v. Vigil,* 251 P.3d 442, 448 (Colo.App.2010) (quoting *Quintano v. People,* 105 P.3d 585, 589 (Colo.2005)).

¶ 37 "To determine whether a defendant's conduct may support multiple convictions, we first identify the legislatively defined unit of prosecution. We then examine the evidence to determine whether the defendant's conduct constituted factually distinct offenses. If the convictions are not based on separate offenses, they merge with one another." *Id.* (citations omitted).

¶ 38 Vehicular eluding is proscribed by section 18–9–116.5, C.R.S.2014. In *People v. McMinn,* 2013 COA 94, —— P.3d ——, a division of this court determined, with respect to the legislatively defined unit of prosecution, that "to commit vehicular eluding, a person operating a motor vehicle must, among other things, knowingly elude or attempt to elude a peace officer also operating a motor vehicle." *Id.* at ¶ 25. Although the statute "plainly contemplates a particular volitional act against a particular officer[,] ... the number of officers involved [does not] necessarily determine[ ] the number of ... offenses." *Id.* "Thus, the unit of prosecution for vehicular eluding must be defined not in terms of the number of officers involved, but in terms of discrete volitional acts of eluding that have endangered the public." *Id.* at ¶ 26. Consequently, the division held, "a defendant may be charged with multiple offenses of vehicular eluding arising from a single criminal episode when he or she has performed discrete acts of eluding one or more peace officers, each constituting a new volitional departure in the defendant's course of conduct." *Id.* at ¶ 27 (rejecting the argu-

ment that "vehicular eluding is a continuing offense that encompasses the entire course of conduct beginning with the defendant's initial intent to elude and ending when the pursuit ends").

¶ 39 In *McMinn*, the defendant was charged with four counts of vehicular eluding based on his actions over an eighteen-minute period. Initially, he had driven out of a cul-de-sac past two officers who had followed him there after signaling him to stop. One of the two officers then lost sight of him, but the other followed him into a dead-end street, where the defendant turned his truck around, and, over yells for him to stop, drove past the officer, who had gotten out of his car. Shortly thereafter, a third officer saw the defendant's vehicle, and activated his siren, but the defendant, again, did not stop, even when the third officer unsuccessfully tried to use a PIT maneuver to end the pursuit. The defendant "power[ed] out" of the PIT maneuver by accelerating, at which point, a fourth officer became the primary officer in pursuit. The chase ended when the defendant reversed directions, slid onto the shoulder of the road, and got stuck in the snow after the fourth officer used his vehicle to push the defendant's truck down a hill. *Id.* at ¶¶ 2–7.

¶ 40 The division determined that

the record amply supports the trial court's determination that each officer's ... described pursuit took place at a different time and in a different location, was separated by an intervening event, and included a discrete and new volitional act by [the defendant]. Stated otherwise, this was not merely a single, continuous, and uninterrupted volitional act of eluding by [the defendant] with several officers simultaneously in pursuit. Rather, [the defendant] took different evasive actions at different times against different police officers, and this evidence rendered each officer's chase sufficiently distinct from the others so as to support separate convictions.

*Id.* at ¶ 35.

¶ 41 The division concluded that "although [the defendant's conduct was] arguably part of a single chain of events leading to his arrest, [it] involved different volitional acts directed at different officers at different times," and thus, supported four separate convictions. *Id.* at ¶ 38.

¶ 42 Here, as in *McMinn*, the two counts of eluding involved separate offenses because they involved separate acts of eluding committed by defendant at different times and places. Defendant initially eluded both officers until, as in *McMinn*, only one of the two officers could continue the pursuit. During the subsequent chase on the interstate, the one deputy, as in *McMinn*, attempted to stop defendant using a "PIT maneuver." But, again, similar to *McMinn*, defendant was able to spin out and continue driving for a short distance until his car broke down. Defendant's avoidance of the one deputy's attempt to stop him constituted a "new volitional departure in the defendant's course of conduct," separate from his earlier, initial act of eluding both of the deputies. *See id.* at ¶¶ 31, 34 (the defendant's separate volitional acts of eluding included accelerating past an officer who tried to block him into a dead-end street, driving past two officers who tried to block him into a cul-de-sac, accelerating out of another officer's "PIT maneuver," and driving away from a fourth officer and attempting to pull away as the officer tried to pin the officer's car against the defendant's truck).

¶ 43 Consequently, we conclude that, consistent with double jeopardy protections, the evidence was sufficient to support two separate convictions of vehicular eluding.

¶ 44 Further, consistent with *McMinn*, we reject defendant's argument that one of the convictions must nonetheless be vacated because (1) "the State's position at trial was that [defendant] was guilty of two counts of vehicular eluding for the simple reason that two officers pursued him"; and (2) "no one—not the prosecutor, not the court, and not the jury—assessed the evidence the way the Attorney General does on appeal."

¶ 45 Double jeopardy issues based on claims of multiplicity are resolved on the basis of two considerations: the appropriate unit of prosecution for an offense, and the sufficiency of the evidence supporting a find-

ing of factually distinct offenses. They are not resolved on the basis of the positions taken by the parties at trial. *Cf. id.* at ¶¶ 25–27, 33–38 (upholding separate convictions, despite the People's erroneous contention that "the number of officers involved necessarily determines the number of different offenses").

## V. Correction of Mittimus

¶ 46 Defendant contends, the Attorney General concedes, and we agree, that the mittimus incorrectly reflects a conviction for aggravated robbery. The record shows that the jury acquitted defendant of aggravated robbery but convicted him of the lesser included offense of robbery. Accordingly, the mittimus must be corrected to conform to the jury's verdicts.

## VI. Conclusion

¶ 47 The judgments of conviction are affirmed, and the case is remanded to the trial court with directions to correct the mittimus to reflect that defendant was convicted of robbery, not aggravated robbery.

JUDGE HAWTHORNE and JUDGE DUNN concur.